**Richard D. THOMPSON**

v.

**Herbert G. ADCOX.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Aug. 13, 2001.

Application for Permission to Appeal Denied by Supreme Court Jan. 7, 2002.

Barry L. Abbott, Chattanooga, TN, for appellant, Herbert G. Adcox.

Robert D. Bradshaw, Chattanooga, TN, for appellee, Richard D. Thompson.

## OPINION

SUSANO, J., delivered the opinion of the court, in which SWINEY, J., joined.

This is an action to collect on a check. The plaintiff's suit was brought pursuant to T.C.A. § 47–29–101 (Supp.2000), a statute dealing with dishonored checks and drafts. William Aubrey Thompson ("the elder Thompson") and his adult son, Richard D. Thompson ("the plaintiff") (collectively referred to as "the Thompsons"), agreed to loan Darlene Lane–Detman $60,000. The Thompsons agreed to make the loan but only upon the condition that the defendant, Herbert G. Adcox, would guarantee repayment by delivering to the plaintiff a personal check in the amount of $60,000, post-dated to the due date of Lane–Detman's obligation. Adcox agreed and subsequently delivered a post-dated check for $60,000 payable to the plaintiff. After Lane–Detman failed to repay the loan when due, Adcox stopped payment on his post-dated check. The plaintiff responded by suing Adcox. Following a bench trial, the court below awarded the plaintiff a judgment against Adcox for $90,378.97. Adcox appeals, arguing that the trial court erred (1) in holding that Adcox's "post-dated check" is a "check" as that term is used in T.C.A. § 47–29–101 and in "borrowing" the concept of an inference of fraudulent intent from the criminal worthless check statute; (2) in denying his motion to dismiss at the close of the plaintiff's proof; (3) in making an award of more than $500 over the face amount of the check in violation of T.C.A. § 47–29–101(d); (4) in excluding Adcox's testimony that Lane–Detman told him to stop payment on his check because the deal was off; and (5) in finding that the evidence preponderates that Adcox acted with fraudulent intent when he stopped payment on his check. We affirm.

### I.

The elder Thompson is in the title pawn business in Chattanooga. Adcox is an automobile dealer in the same city. In early 1998, Lane–Detman asked the elder Thompson to loan her $15,000. The latter agreed to the loan but demanded that the loan be secured by Adcox's personal, post-dated check. The three of them met at Adcox's office. The elder Thompson gave Lane–Detman $15,000 in cash, which he counted out in Adcox's presence. Adcox gave the elder Thompson a personal check in the amount of $15,000, post-dated to February 6, 1998, the date by which Lane–Detman was to repay the loan. When Lane–Detman did not repay the loan, the elder Thompson cashed Adcox's check. That transaction did not lead to litigation.

On February 20, 1998, Lane–Detman asked the elder Thompson for an additional loan, this time in the amount of $60,000. The second loan was the genesis for the instant action. The elder Thompson apparently did not have the full $60,000, so he contacted his son, the plaintiff, and together they came up with the full amount. According to the Thompsons' testimony at trial, the plaintiff was to fund the loan with a $25,000 check, and the elder Thompson was to put up the remainder of the loan in the form of $35,000 in cash. As a part of the deal, Adcox again agreed to secure the transaction by issuing a check to the plaintiff for $60,000, post-dated to March 20, 1998, the due date of Lane–Detman's repayment. Both of the Thompsons testified at trial that they would not have made the loan but for Adcox's post-dated check.

The elder Thompson, Lane–Detman, and Adcox met at the latter's office on February 20, 1998, to consummate the transaction. Adcox gave the elder Thompson his post-dated check that day. The check was made payable to the plaintiff. The loan to Lane–Detman was funded in part with the plaintiff's $25,000 check. This fact was not in dispute at trial. The remaining $35,000, however, is sharply disputed. The elder Thompson testified that he brought cash of $35,000 in a brown paper bag to the meeting, which cash he had obtained from the vault at his title and loan business. He testified that the cash was counted in Adcox's presence. There was no documentation of the cash portion of the transaction.

Adcox testified at trial that the $35,000 was not counted in his presence and that he never saw Lane–Detman receive either the check or the currency.[1] Lane–Detman was the only other person in the room, and she was not present at trial.

When Lane–Detman did not repay the loan by the due date of March 20, 1998, the elder Thompson phoned Adcox, who asked for an extension of time, which the elder Thompson granted. On May 28, 1998, after having talked with Lane–Detman, the plaintiff deposited the check. On June 2, 1998, Adcox stopped payment on the check. The bank informed the elder Thompson, upon his inquiry, that Adcox had given no reason for his stop payment instruction. The elder Thompson testified at trial that, by this time, Lane–Detman had disappeared and Adcox would not return his phone calls.

Adcox testified at trial that he stopped payment on the check because he believed that the loan to Lane–Detman had not been funded. Through an offer of proof, he testified that his source for this informa-

tion was a conversation with Lane–Detman. He was uncertain as to the timing of this conversation. In a deposition, he had stated that it took place four or five days after he wrote his post-dated check on February 20, 1998. As previously indicated, however, Adcox did not stop payment on the check until June 2, 1998. When confronted at trial with this anomaly, Adcox testified that he must have been wrong in saying that his conversation with Lane–Detman had taken place four or five days after writing the check.

During the trial, Adcox's counsel elicited testimony concerning the elder Thompson's several felony convictions. He also presented evidence that the title pawn company, ownership of which was claimed by the elder Thompson, was in fact in his daughter's name. A Hamilton County Deputy Clerk testified that the elder Thompson could not have obtained a license to operate a title pawn business due to his felony convictions. The elder Thompson testified that his daughter incorporated the business and later conveyed all of her interest in the company to him.

At the close of the plaintiff's proof, Adcox moved to dismiss. The trial court denied the motion, stating as follows:

I think the inference here with regard to the fact that this $60,000 wasn't repaid by Ms. Detman in 30 days, it was Mr. Adcox who asked for additional time to see if he couldn't collect the check. And I think that it's possible to infer that having taken the $15,000 loss as a result of an earlier transaction, he decided he wasn't about to take another $60,000 loss and therefore tried to do the self-remedy thing of trying to collect it from her. And when he couldn't, he decided

1. When the plaintiff produced the cancelled $25,000 check during discovery, Adcox ac-

knowledged that this portion of the loan to Lane–Detman had been funded.

to stop payment on the check to protect himself.

Following the denial of his motion, Adcox put on proof. Upon conclusion of the bench trial, the court below found for the plaintiff. In discussing whether Adcox had "fraudulent intent" within the meaning of T.C.A. § 47–29–101, the court analogized to a criminal statute, T.C.A. § 39–14–121, which specifically permits an inference of fraudulent intent if the person signing the check fails to make the check good within ten days after notice of nonpayment. The court found that the same inference could be made under the civil statute. In addition, the court listed several other findings of fact and stated that they

> indicate Mr. Adcox's knowledge of his vulnerable position and his effort to try to get the money from Ms. Lane–Detman. When he could not get the money from her, he stopped payment on the check....
>
> Under all of the circumstances, the court can only conclude that Mr. Adcox had fraudulent intent when he issued the stop payment on the check.

The trial court accordingly awarded the plaintiff $90,378.97, broken down as follows:

(1) the $60,000 face amount of the check;

(2) $13,873.97 as interest at 10% from March 20, 1998 until the date of the trial court's order;

(3) $5 as a bank service charge; and

(4) $16,500 as a reasonable attorney's fee.

## II.

In this non-jury case, our review is *de novo* upon the record, with a presumption of correctness as to the trial court's factual determinations, unless the evidence preponderates otherwise. Tenn. R.App. P. 13(d); *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn.1995); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn.1993). The trial court's conclusions of law, however, are accorded no such presumption. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn.1996).

Our *de novo* review is also subject to the well-established principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such determinations are entitled to great weight on appeal. *Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn.Ct.App. 1995); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn.Ct.App.1991).

## III.

### A.

The plaintiff brought this suit pursuant to T.C.A. § 47–29–101 (Supp.2000), which is a civil statute dealing with liability for a dishonored check. It provides, in pertinent part, as follows:

(a) A person who, having executed and delivered to another person a check or draft drawn on or payable at a bank or other financial institution, *with fraudulent intent* either stops payment on the check or draft, or allows the check or draft to be dishonored by a financial institution because of lack of funds, failure to have an account, or lack of an authorized signature of the drawer or necessary endorser, is, if found liable to the holder on the check or draft in a civil action, liable for:

(1) The face amount of the check dishonored;

(2) Interest at the rate of ten percent (10%) per annum on the face amount or the remaining unpaid balance of the check or draft from the date of its execution until payment is made in full;

(3) Any reasonable service charges incurred by the payee in attempting to obtain payment by the bank or other financial institution;

(4) Court costs incurred in bringing the civil action which is brought by the holder to collect on the check or draft; and

(5) Reasonable attorney fees incurred by the holder.

(b) This section does not apply to a person who has so allowed a check or draft to be dishonored if, within ten (10) days after the holder has given notice that the check or draft has not been paid by the financial institution, the person pays to the holder the full amount of the check or draft. Such a payment is effective for all purposes as of the date it is made.

\* \* \*

(d) If the person who executed and delivered the check does not pay to the holder the full amount of the check or draft within thirty (30) days following certified mailing of written notice that the check or draft has not been paid and that treble damages will be sought, upon finding of fraudulent intent, the person is liable for, and the court shall award judgment for, treble the face amount of the check or draft. However, the amount awarded in addition to the face amount of the check or draft may not exceed five hundred dollars ($500).

(e) A person must elect whether to pursue the claim either under this section or under title 39, chapter 14, part 1.

(Emphasis added).

In its memorandum opinion, the court stated as follows:

The only question is whether the facts of this case come within the meaning of the term "with fraudulent intent." There is a similar criminal statute on checks.

T.C.A. § 39–14–121 "Worthless Checks" is the criminal statute that is analogous to T.C.A. § 47–29–101. Under the criminal statute fraudulent intent is inferred if the person signing the check fails to make the check good within ten (10) days after notice of nonpayment. The court believes, because of the similarity of the statutes and the requirement that a holder cannot pursue both the civil and criminal statutes, that fraudulent intent may be inferred from Mr. Adcox's failure to pay the check after notice from the Plaintiff's attorneys.

T.C.A. § 39–14–121 (1997) is a criminal statute, which deals with theft by way of a worthless check. It provides, in pertinent part, as follows:

(a) A person commits an offense who, with fraudulent intent or knowingly:

(1) Issues or passes a check or similar sight order for the payment of money for the purpose of paying any fee, fine, tax, license or obligation to any governmental entity or for the purpose of obtaining money, services, labor, credit or any article of value, knowing at the time there are not sufficient funds in or on deposit with the bank or other drawee for the payment in full of the check or order, as well as all other checks or orders outstanding at the time of issuance; or

(2) Stops payment on a check or similar sight order for the payment of money for the purpose of paying any fine, fee, tax, license or obligation to any governmental entity or for the purpose of obtaining money, services, labor, credit or any article of value; provided, that such money, credit, goods or services were as represented at the time of the issuance of the check or similar sight order.

(3) This subsection shall not apply to a post-dated check or to a check or similar sight order where the payee or holder

knows or has good and sufficient reason to believe the drawer did not have sufficient funds on deposit to the drawer's credit with the drawee to ensure payment.

(b) For purposes of this section, the issuer's or passer's fraudulent intent or knowledge or both of insufficient funds may be inferred if:

(1) The person had no account with the bank or other drawee at the time the person issued or passed the check or similar sight order; or

(2) On presentation within thirty (30) days after issuing or passing the check or similar sight order, payment was refused by the bank or other drawee for lack of funds, insufficient funds or account closed after issuing or passing the check or order, and the issuer or passer fails to make good within ten (10) days after receiving notice of that refusal.

## B.

Adcox first argues that "[t]he Trial Court erred as [a] matter of law because post-dated checks are not subject to the worthless check law...." Apparently, his argument is that the plaintiff is not entitled to the remedies provided for in T.C.A. § 47–29–101. More specifically, he argues that a "post-dated check" is not a "check" and that therefore, the plaintiff cannot recover under T.C.A. § 47–29–101 because that statute provides remedies for dishonored "checks."

Adcox relies upon the case of *State v. Stooksberry*, 872 S.W.2d 906 (Tenn.1994) for the proposition that a "post-dated check" is not a "check." In *Stooksberry*, the defendant purchased cattle on April 13, 1990, using a check dated April 15, 1990. *See id.* at 906–07. The seller deposited the check on the date he received it, *i.e.*, April 13, 1990. *See id.* at 907. The check was subsequently dishonored for insufficient funds. *See id.*

The defendant was tried and convicted of issuing a worthless check in violation of the criminal statute, T.C.A. § 39–14–121. *See id.* at 906. Upon appeal, the Supreme Court looked to the Uniform Commercial Code and determined that a "post-dated check" is not a "check" within the contemplation of the criminal worthless check law, because such an instrument is not payable on demand. *See id.* at 907. However, in reversing the defendant's conviction, the Supreme Court emphasized that the criminal statute, as pertinent to the facts before it, deals with a particular time frame, *i.e.*, the time at which the instrument is passed:

> The gravamen of the offense defined by the statute is the "fraudulent intent" with which the instrument is *passed or uttered. The offense is not the failure to pay the check after notice, but passing the instrument with the then present intent to defraud.*

> * * *

> ..., the *passing* of a post-dated check does not subject the maker to conviction under the worthless check law.

*Id.* at 907–08 (emphasis added). Therefore, the Supreme Court in *Stooksberry* held that a "post-dated check" is not a "check" for the purpose of the criminal worthless check statute because, at the time of the passing of the instrument, it is not payable on demand.

■ We understand the rationale of *Stooksberry*, but we do not believe it resolves the question before us. As applied to the instant case, *Stooksberry* merely means that on February 20, 1998—the time of the passing of Adcox's post-dated check—the instrument was not a "check" as that concept is defined in T.C.A. § 47–

3–104(f) (1996)[2] because it was not *then* payable on demand. Unlike *Stooksberry,* which focuses *on the time of the passing of the instrument,* the instant case focuses on an event occurring *subsequent to the date of the instrument.* Prior to March 20, 1998—the date of Adcox's check—the instrument in question was not payable on demand. However, on and after the date of March 20, 1998, it *was* payable on demand. This is because the holder was at liberty to demand payment on and after that date. *See* T.C.A. § 47–3–113(a) (1996) ("An instrument may be antedated or post-dated. The date stated determines the time of payment if the instrument is payable at a fixed period after date. Except as provided in § 47–4–401(c), *an instrument payable on demand is not payable before the date of the instrument.*") (emphasis added); *see also Gentry v. People,* 166 Colo. 60, 441 P.2d 675, 676 (1968) ("The fact that an instrument is postdated does not render it void, but merely defers negotiability to a subsequent time."); *Allied Color Corp. v. Manufacturers Hanover Trust Co.,* 484 F.Supp. 881, 883 (S.D.N.Y.1980) ("It is clear that a postdated check is not, *prior to date,* a 'check' as defined in N.Y.U.C.C. § 3–104(2)(b),[3] since it is not 'payable on demand' ....") (emphasis added).

Hence, while we agree with Adcox that *Stooksberry* stands for the proposition that a "post-dated check" is not a "check" *under the criminal worthless check statute* given the facts present in *Stooksberry,* we do not believe that the holding in that case precludes the plaintiff from recovering under T.C.A. § 47–29–101 if the plaintiff can prove that Adcox stopped payment on the instrument with fraudulent intent.

### C.

As a part of his first argument, Adcox also challenges the trial court's use of the inference of fraudulent intent found in the criminal worthless check statute to support its finding, by inference, of fraudulent intent on the part of Adcox. Adcox appears to be arguing that because "the passing of a post-dated check does not subject the maker to conviction under the worthless check law," *see Stooksberry,* 872 S.W.2d at 908, it was improper for the trial court in the instant case to analogize to the worthless check law to support its finding that "fraudulent intent may be inferred from Mr. Adcox's failure to pay the check after notice from the Plaintiff's attorneys."

■ Viewing the argument in this way, we still find this issue adverse to Adcox. We are of the opinion that, with or without the analogy to the criminal statute, it is not inappropriate in this case to infer fraudulent intent from the act of stopping payment on the subject check and failing to pay the check after notice of its nonpayment. An inference is defined as "[a] process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved or ad-

---

**2.** T.C.A. § 47–3–104(f) provides, in pertinent part, as follows:

"Check" means (i) a draft, other than a documentary draft, payable on demand and drawn on a bank or (ii) a cashier's check or teller's check....

**3.** N.Y.U.C.C. § 3–104(2)(b) is identical to T.C.A. § 47–3–104(2)(b) (1992), which provides as follows:

(2) A writing which complies with the requirements of this section is:

\* \* \*

(b) a "check" if it is a draft drawn on a bank and payable on demand.

T.C.A. § 47–3–104 (1992) was the predecessor statute of T.C.A. § 47–3–104(f) (1996), which, as we have previously stated, also requires that a "check" be an instrument payable on demand and drawn on a bank.

mitted." *Black's Law Dictionary* 778 (6th ed.1990). A check is written for a specific purpose, *i.e.*, to direct one's bank to withdraw funds from one's account at that bank. When one stops payment on a check, he or she is thwarting that which he or she had earlier set into motion. It is undisputed that Adcox wrote a post-dated check to the plaintiff; it is further undisputed that he stopped payment on that check and continued to refuse to make the check good after receiving notice of its nonpayment. The proof also reflected that Adcox asked the elder Thompson for, and received, additional time within which to secure repayment of the loan. When these facts are coupled with the fact that Adcox had lost $15,000 on the earlier Lane–Detman transaction, it was logical for the trial court to deduce from all of this, even without the aid of the criminal statute, that Adcox acted with fraudulent intent when he stopped payment on his check. Therefore, without deciding whether the trial court was correct to draw an analogy to the inference of fraudulent intent found in the criminal statute, we find no error in the court's decision to infer that Adcox acted with fraudulent intent.

### D.

At the close of the plaintiff's proof, Adcox moved to dismiss his adversary's case pursuant to Tenn. R. Civ. P. 41.02(2).[4] The Supreme Court in *City of Columbia v.*

*C.F.W. Construction Company,* 557 S.W.2d 734 (Tenn.1977), discussed the proper standard pursuant to which a trial court is to view such motions. In that case, the Court stated that

> in the non-jury case, when a motion to dismiss is made at the close of plaintiff's case under Rule 41.02(2), the trial judge must impartially weigh and evaluate the evidence in the same manner as though he were making findings of fact at the conclusion of all of the evidence for both parties, determine the facts of the case, apply the law to those facts, and, if the plaintiff's case has not been made out by a preponderance of the evidence, a judgment may be rendered against the plaintiff on the merits, or, the trial judge, in his discretion, may decline to render judgment until the close of all the evidence. The action should be dismissed if on the facts found and the applicable law the plaintiff has shown no right to relief.

*Id.* at 740.

Adcox argues that the trial court erred in failing to dismiss the case at the close of the plaintiff's proof. More specifically, he argues that the trial court erred in inferring fraudulent intent based on the criminal worthless check statute and in finding fraudulent intent based on facts that were not introduced into evidence until after the close of the plaintiff's proof.

4. Tenn. R. Civ. P. 41.02(2) provides as follows:

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of plaintiff's evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court shall reserve ruling until all parties alleging fault against any other party have

> presented their respective proof-in-chief. *The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence;* in the event judgment is rendered at the close of plaintiff's evidence, the court shall make findings of fact if requested in writing within three days after the announcement of the court's decision.
> (Emphasis added).

■ We find no error in the trial court's denial of Adcox's motion. In ruling upon the motion, the trial court stated the following:

> I think the inference here with regard to the fact that this $60,000 wasn't repaid by Ms. Detman in 30 days, it was Mr. Adcox who asked for additional time to see if he couldn't collect the check. And I think that it's possible to infer that having taken the $15,000 loss as a result of an earlier transaction, he decided he wasn't about to take another $60,000 loss and therefore tried to do the self-remedy thing of trying to collect it from her. And when he couldn't, he decided to stop payment on the check to protect himself.

At the close of the plaintiff's proof, there was evidence in the record to support the court's findings that Lane–Detman did not repay the $60,000, that Adcox asked for an extension of time, and that Adcox had incurred a $15,000 loss as a result of an earlier, similar transaction. The evidence also showed that Adcox stopped payment on the $60,000 check he had written to the plaintiff. As we have already stated, we believe it is not inappropriate to infer from these facts that Adcox acted with fraudulent intent in stopping payment on the check. The trial court's denial of Adcox's motion to dismiss at the close of the plaintiff's proof was clearly within its discretion. We therefore find this issue adverse to Adcox.

### E.

Adcox next argues that the trial court erred in awarding the plaintiff $90,378.97. He asserts that the award is in violation of T.C.A. § 47–29–101(d), which, so the argument goes, limits an award to $500 over the face amount of the check. We disagree with Adcox's position on this matter.

■ The rules relating to statutory construction are well-settled:

> Issues of statutory construction are questions of law and shall be reviewed *de novo* without a presumption of correctness. This Court's role in statutory interpretation is to ascertain and to effectuate the legislature's intent. Generally, legislative intent shall be derived from the plain and ordinary meaning of the statutory language when a statute's language is unambiguous. If a statute's language is expressed in a manner devoid of ambiguity, courts are not at liberty to depart from the statute's words. Accordingly, courts are restricted to the "natural and ordinary" meaning of a statute unless an ambiguity necessitates resorting elsewhere to ascertain legislative intent.

*Freeman v. Marco Transp. Co.*, 27 S.W.3d 909, 911–12 (Tenn.2000) (citations omitted).

T.C.A. § 47–29–101 (Supp.2000) provides, in pertinent part, as follows:

> (a) A person who…with fraudulent intent…stops payment on [a] check…is, if found liable to the holder on the check or draft in a civil action, liable for:

> (1) The face amount of the check dishonored;

> (2) Interest at the rate of ten percent (10%) per annum on the face amount or the remaining unpaid balance of the check or draft from the date of its execution until payment is made in full;

> (3) Any reasonable service charges incurred by the payee in attempting to obtain payment by the bank or other financial institution;

> (4) Court costs incurred in bringing the civil action which is brought by the holder to collect on the check or draft; and

(5) Reasonable attorney fees incurred by the holder.

\* \* \*

■ (d) If the person who executed and delivered the check does not pay to the holder the full amount of the check or draft within thirty (30) days following certified mailing of written notice that the check or draft has not been paid and that treble damages will be sought, upon finding of fraudulent intent, the person is liable for, and the court shall award judgment for, treble the face amount of the check or draft. However, the amount awarded in addition to the face amount of the check or draft may not exceed five hundred dollars ($500).

We think the statute is clear and unambiguous. As we read it, the last sentence of subsection (d) applies only to that subsection and does not limit the remedies provided for in subsection (a). Had the legislature intended for this subsection (d) limitation to apply to the specific remedies in the other subsections, it could have so stated. It did not, and we find no basis in the statutory language for doing that which the legislature failed to do by express language. We find this issue to be without merit.

## F.

Finally, Adcox argues that the trial court improperly excluded evidence showing that he stopped payment on the check because Lane–Detman told him that "the deal was off." He further argues that the evidence preponderates against the trial court's finding that he stopped payment on the check with fraudulent intent.

■ We agree with Adcox that the trial court improperly excluded Adcox's testimony that Lane–Detman told him to stop payment on his check because the deal was off. Tenn. R. Evid. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence *to prove the truth of the matter asserted.*" (Emphasis added). Adcox was not offering the statement to prove that the deal was in fact off, but rather to show that he believed it to be off and that it was for this reason he stopped payment on the check. His reason for stopping payment on the check is clearly relevant to the issue of whether he acted with fraudulent intent. Hence, the statement is not hearsay and should not have been excluded. *Cf. State v. Miller*, 737 S.W.2d 556, 559 (Tenn.Crim.App.1987).

■ However, we do not feel that the trial court's error necessitates a reversal of the trial court's judgment. Tenn. R.App. P. 36(b) provides as follows:

A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.

In the instant case, the trial court made extensive factual findings upon which it based its determination that Adcox acted with fraudulent intent. The evidence does not preponderate against these factual findings. Moreover, we note that Adcox's offer of proof presented the trial court with a serious credibility issue. Although Adcox testified that he stopped payment on the check because he thought that Lane–Detman had not received the money promised by the Thompsons, he was uncertain as to when he received this information from her. When the excluded evidence is viewed in the context of other particularly relevant evidence, *e.g.*, (1) the testimony of the elder Thompson that Ad-

cox was present on February 20, 1998, when Lane Detman received the plaintiff's check of $25,000 and cash of $35,000;[5] and (2) Adcox's deposition testimony reflecting that he waited some three months after learning, for the first time according to him,[6] that the loan to Lane–Detman had not been funded before stopping payment on his $60,000 check, we are compelled to find, based upon the totality of the proof received into evidence, that the excluding of the subject evidence, while error, did not involve "a substantial right [that] more probably than not affected the [trial court's] judgment."

## IV.

The judgment of the trial court is affirmed. The case is remanded for enforcement of the trial court's judgment and for collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed to the appellant, Herbert G. Adcox.

FRANKS, J., not participating.

---

**5.** While not resolving the conflict in the testimony of the elder Thompson and Adcox as to whether Lane–Detman received $35,000 cash from the elder Thompson in Adcox's presence, the trial court did opine "[o]ne can only wonder why Mr. Adcox, such a successful business person, would write a check for $60,000.00 without being satisfied that Ms. Lane–Detman had received the money."

**6.** Of course, if the elder Thompson's testimony is to be believed, Adcox actually observed the full funding of the loan to Lane–Detman at the February 20, 1998, meeting.