IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
JUNE 17, 2008 Session

IN THE MATTER OF:
THE ESTATE OF ALLEN CRAWFORD ROBERTS, DECEASED

WILLIAM B. SIMMONS, EXECUTOR, ET AL. v. ESTHER MAY ROBERTS

Direct Appeal from the Probate Court for Shelby County
No. C-13103     Robert Benham, Judge

No. W2007-01903-COA-R3-CV - Filed December 2, 2008

In this appeal, we are asked to determine whether the probate court erred when it granted Appellee's motion for a directed verdict. The probate court found that Appellants, in their proof in chief, did not satisfactorily make out a prima facie case of the Antenuptial Agreement's validity under the statutes and appellate opinions of Tennessee as Appellants failed to establish that there was a satisfactory disclosure of Mr. Roberts' assets. On appeal, Appellants contend that the motion for a directed verdict was improperly granted as reasonable minds could conclude that the Antenuptial Agreement was presented to, read, and understood by Appellee at execution and that the Antenuptial Agreement constituted a full and fair disclosure as required by Tennessee law. Although Appellants have urged an incorrect standard of review, we find, after a de novo review of the evidence, that Appellants made out a prima facie case by a preponderance of the evidence. We reverse and remand to the probate court for further proceedings.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Probate Court Reversed and
Remanded

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which HOLLY M. KIRBY, J., and WALTER C. KURTZ, SR., J., joined.

Larry Rice, Rachel Gallant, Memphis, TN, for Appellant

Lewis K. Garrison, Phillip J. Cooper, James H. Bostick, Memphis, TN, for Appellee

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Esther May Hammons Roberts ("Mrs. Roberts" or "Appellee") and Allen Crawford Roberts ("Mr. Roberts") were married on May 26, 1994, and lived together until Mr. Roberts' death on October 16, 2005. On November 22, 2005, William B. Simmons, Mr. Roberts' nephew ("Mr. Simmons"), and Kenneth Rector ("Mr. Rector") (collectively, "Co-Executors" or "Appellants") filed, in the Shelby County Probate Court, a Petition to Admit to Probate the Last Will and Testament of Allen Crawford Roberts, Deceased and to Appoint Executor. The Probate Court, Division One, admitted the Will to probate and appointed Mr. Simmons and Mr. Rector co-executors.

On January 10, 2006, Mrs. Roberts filed a Petition for an elective share of Mr. Roberts' estate ("the Estate"), for exempt property, and for one year's support. The Co-Executors filed a Response, on April 23, 2006, asserting that Mrs. Roberts, by signing the Antenuptial Agreement (sometimes hereinafter "Agreement"), had waived her right to make any claims against the Estate. Thus, the Co-Executors filed a Motion to Dismiss on the Pleadings or in the Alternative Motion to Require Wife to Plead Any Defenses She Has to the Antenuptial Agreement, on August 18, 2006. On September 18, 2006, Mrs. Roberts filed an Answer to Motion to Dismiss on the Pleadings or in the Alternative Motion to Require Wife to Plead Any Defenses She Has to the Antenuptial Agreement ("Answer to Motion to Dismiss"), pleading numerous defenses to the Antenuptial Agreement's enforcement. Mrs. Roberts also filed an Answer of Eshter [sic] Roberts, Surviving Spouse of Allen Crawford Roberts, Deceased[,] to Petitiion [sic] to Probate Will and Approve Pre-Nuptial Agreement ("Answer to Petition") on December 28, 2006.[1] A bench trial commenced on July 17, 2007, concerning the validity of the Antenuptial Agreement. At the conclusion of the proof in chief for the Co-Executors, counsel for Mrs. Roberts made a motion for a directed verdict, which was granted by the trial court. The trial court, in its Order Finding Antenuptial Agreement Between Allen Crawford Roberts and Esther May Roberts Unenforceable, stated that

> upon consideration of the arguments made by respective counsel, the Court was of the opinion that the requisite proof before the Court, was not satisfactory, under the statutes and appellate opinions of Tennessee, to make out a prima facie case. Therefore, the motion for directed verdict was well taken, and the Court granted the motion.

This Appeal followed.

### II. ISSUE PRESENTED

---

[1] Presumably, Mrs. Roberts was answering the Co-Executors' Petition to Admit to Probate the Last Will and Testament of Allen Crawford Roberts, Deceased and to Appoint Executor, filed November 22, 2005.

Appellants have timely filed their notice of appeal and present the following issue for review:

1.      Whether the trial court erred when it granted Appellee's Motion for Directed Verdict.

For the following reasons, we reverse the decision of the probate court.

### III.   STANDARD OF REVIEW

This case was tried by the trial judge without a jury, and at the conclusion of the Co-Executors' proof, the trial court, upon Mrs. Roberts' request, granted a Motion for Directed Verdict. We feel compelled to digress to comment on the procedure utilized in this case. Tennessee courts have clearly explained the proper procedure to be followed:

> Motions and orders for directed verdicts are pursuant to Tenn. R. Civ. P. 50 and are appropriate only in jury trials. *City of Columbia v. C.F.W. Constr*[.] *Co.,* 557 S.W.2d 734, 740 (Tenn. 1977); *Scott v. Pulley*, 705 S.W.2d 666, 672 (Tenn. Ct. App. 1985); *Roberts v. Robertson County Bd. of Educ.*, 692 S.W.2d 863, 874 (Tenn. Ct. App. 1985). They have no place in nonjury trials. *Id.* If a party desires to challenge the sufficiency of the plaintiff's proof in a nonjury trial, it must file a motion for involuntary dismissal at the close of plaintiff's proof pursuant to Tenn. R. Civ. P. 41.02(2).

*Morris v. Morris*, No. 02A01-9610-CH-00236, 1997 WL 703379, at \*2 (Tenn. Ct. App. W.S. Nov. 12, 1997). The  distinction is critical as

> [t]he respective standards of review of the trial court's disposition of these motions is markedly different.  In the case of a motion for directed verdict, the trial court must take the strongest legitimate view of the evidence against the directed verdict and must deny the motion in any case where reasonable persons would not reach the same conclusions. *Goode v. Tamko Asphalt Prods.*, 783 S.W.2d 184, 187 (Tenn. 1989); *Maddux v. Cargill, Inc.*, 777 S.W.2d 687, 691 (Tenn. Ct. App. 1989).

*Morris,* 1997 WL 703379, at \*3 (1997).  Furthermore,
> [a] directed verdict should not be granted if the party with the burden of proof has presented sufficient evidence to create an issue of fact for the jury to decide. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 231 (Tenn. Ct. App. 1999).  A jury issue has been created if there is any doubt regarding the conclusions to be drawn from the evidence, *Crosslin v. Alsup*, 594 S.W.2d 379, 380 (Tenn. 1980), or if reasonable

> persons could draw different conclusions from the evidence. *Hurley v. Tennessee Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 891 (Tenn. Ct. App. 1995); *Pettus v. Hurst*, 882 S.W.2d 783, 788 (Tenn. Ct. App. 1993). A jury issue has not been created when reasonable minds can only draw one conclusion from the evidence. *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994); *Tompkins v. Annie's Nannies, Inc.*, 59 S.W.3d 669, 673 (Tenn. Ct. App. 2000).

*Burton v. Warren Farmers Coop.*, 129 S.W.3d 513, 520 (Tenn. Ct. App. 2002). However, a motion for an involuntary dismissal is treated differently. Motions for involuntary dismissal

> do not raise questions of law but rather challenge the sufficiency of the plaintiff's proof. *Smith v. Inman Realty Co.*, 846 S.W.2d 819, 821 (Tenn. Ct. App. 1992); *Merriman v. Smith*, 599 S.W.2d 548, 560 (Tenn. Ct. App. 1979). A claim may be dismissed pursuant to a Tenn. R. Civ. P. 41.02(2) motion to dismiss if, based on the law and the evidence, the plaintiff has failed to demonstrate a right to the relief it is seeking. *City of Columbia*, 557 S.W.2d at 740.

*Burton*, 129 S.W.3d at 520. Motions for involuntary dismissal require less certainty than do motions for directed verdict. *Id.* (citing *Smith*, 846 S.W.2d at 822).

> [A] court faced with a Tenn. R. Civ. P. 41.02(2) motion need only impartially weigh and evaluate the plaintiff's evidence just as it would after all the parties had concluded their cases and may dismiss the plaintiff's claims if the plaintiff has failed to make out a prima facie case by a preponderance of the evidence.

*Morris*, 1997 WL 703379, at *3 (1997) (citing *Thompson v. Adcox*, 63 S.W.3d 783, 791 (Tenn. Ct. App. 2001)).

In reviewing a trial court's disposition of a motion for involuntary dismissal, our scope of review is pursuant to Rule 13(d) of the Tennessee Rules of Appellate Procedure. *Burton*, 129 S.W.3d at 521. Tennessee Rule of Appellate Procedure 13(d) requires appellate courts to defer to a trial court's findings of fact. *Boote v. Shivers*, 198 S.W.3d 732, 740 (Tenn. Ct. App. 2005) (citing *Fell v. Rambo* 36 S.W.3d 837, 846 (Tenn. Ct. App. 2000); *Taylor v. Trans Aero Corp.*, 924 S.W.2d 109, 112 (Tenn. Ct. App. 1995)). Thus, an appellate court must "leave a trial court's finding of fact undisturbed unless it determines that the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true." *Id.* (citing *Estate of Haynes v. Braden*, 835 S.W.2d 19, 20 (Tenn. Ct. App. 1992)). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *Id.* This Court must give great weight to the trial court's assessment of the evidence as it is in a better position to evaluate witness credibility. *Id.* (citing *Thompson*, 63 S.W.3d at 787). The

trial court's conclusions of law are reviewed de novo with no presumption of correctness. ***S. Constructors, Inc. v. Loudon County Bd. of Educ.***, 58 S.W.3d 706, 710 (Tenn. 2001) (citing *Daron v. Dep't of Corr.*, 44 S.W.3d 478, 480 (Tenn. 2001); *Johnson v. Johnson*, 37 S.W.3d 892, 894 (Tenn. 2001)).

This case was a nonjury trial in which Mrs. Roberts moved the trial court to direct a verdict in her favor at the close of Co-Executors' proof. Procedurally, this was an inappropriate motion. The appropriate motion was one pursuant to Tennessee Rule of Civil Procedure 41.02(2), a motion for involuntary dismissal. Nevertheless, we conclude, using the correct standard, that the trial court erred in dismissing Co-Executors' action because the evidence presented by Co-Executors established a prima facie case of the Antenuptial Agreement's validity.

## IV. DISCUSSION

On appeal, the Co-Executors assert that the probate court erred when it granted Mrs. Roberts' Motion for Directed Verdict. The Co-Executors contend that the evidence presented before the trial court was such that "reasonable minds could conclude that the documents found attached to the Antenuptial Agreement were presented to, read, and understood by [Mrs. Roberts] at the time the [A]ntenuptial [A]greement was executed." Furthermore, they contend that "[r]easonable minds could also conclude that the documents constituted a full and fair disclosure as mandated by Tenn. Code Ann. § 36-3-501 and Tennessee case law." Thus, they maintain the trial court's grant of a directed verdict was inappropriate. While Appellants have mistakenly argued the standard for a motion for directed verdict, rather than the standard for a motion for involuntary dismissal, this Court will review this case under the appropriate standard–the standard for a motion for involuntary dismissal.

Tennessee's public policy favors the enforcement of antenuptial agreements if certain requirements are met. ***Randolph v. Randolph***, 937 S.W.2d 817, 819 (Tenn. 1996). Tennessee Code Annotated section 36-3-501 enumerates such requirements:

> [A]ny antenuptial or prenuptial agreement entered into by spouses concerning property owned by either spouse before the marriage that is the subject of such agreement shall be binding upon any court having jurisdiction over such spouses and/or such agreement if such agreement is determined, in the discretion of such court, to have been entered into by such spouses freely, knowledgeably and in good faith and without exertion of duress or undue influence upon either spouse. The terms of such agreement shall be enforceable by all remedies available for enforcement of contract terms.

**Tenn. Code Ann. § 36-3-501** (2005).

To satisfy the knowledge requirement, the party seeking to enforce the antenuptial agreement must prove

> by a preponderance of the evidence, either that a full and fair disclosure of the nature, extent, and value of his or her holdings was provided to the spouse seeking to avoid the agreement, or that disclosure was unnecessary because the spouse seeking to avoid the agreement had independent knowledge of the full nature, extent, and value of the proponent spouse's holdings.

*Randolph*, 937 S.W.2d at 821. "The existence of each element is a question of fact to be determined from the totality of the circumstances surrounding the negotiation and execution of the antenuptial agreement." *Boote*, 198 S.W.3d at 741 (citing *Randolph*, 937 S.W.2d at 821). However what is "full and fair" varies from case to case, depending upon certain factors that each court must consider. *Id.* Such factors include "the relative sophistication of the parties, the apparent fairness or unfairness of the substantive terms of the agreement, and any other circumstance unique to the litigants and their specific situation." *Randolph*, 937 S.W.2d at 821 (citing Judith T. Younger, *Perspectives on Antenuptial Agreements: An Update*, 8 J. Am. Acad. Matrim. Law. 1 (1992)). Tennessee law does not require that spouses reveal every asset owned by each, but only sufficient disclosure such "that each contracting party [is] given a clear idea of the nature, extent, and value of the other's property and resources." *Id.* (citation omitted). Although not required, attaching a net worth schedule of assets, liabilities, and income to the agreement provides an effective method of disclosure. *Id.* at 822 (citing *Pajak v. Pajak*, 385 S.E.2d 384, 388 (W. Va. 1989); *Hartz v. Hartz*, 234 A.2d 865, 871, n.3 (Md. 1967)). Likewise, although independent counsel is not required to validate an antenuptial agreement, it "may be the best evidence that a party has entered into an antenuptial agreement voluntarily and knowledgeably[.]" *Boote*, 198 S.W.3d at 822 (citing *Perspectives* at 18). In Tennessee, the presence of independent counsel is simply a factor in determining whether an antenuptial agreement was entered into knowledgeably. *Id.* (citing *Kahn v. Kahn*, 756 S.W.2d 685, 695 (Tenn. 1988).

In reviewing the trial court's grant of a Motion for Directed Verdict, we must give a presumption of correctness to the trial court's findings of fact. In this case, the trial court's Order Finding Antenuptial Agreement Between Allen Crawford Roberts and Esther May Roberts Unenforceable did not include separate findings of fact, and provided only the conclusory statements in its Order Finding Antenuptial Agreement Between Allen Crawford Roberts and Esther May Roberts Unenforceable, that

> the Court was of the opinion that the requisite proof before the Court, was not satisfactory, under the statutes and appellate opinions of Tennessee, to make out a prima facie case.

> [Therefore it satisfactorily appeared to the court] that the proof of the [Appellants], for the validity of the antenuptial

agreement, failed to establish that there was a satisfactory disclosure of his assets, made to [Mrs. Roberts] by [Mr. Roberts], the decedent, in accordance with the statutes and opinions of the appellate cases in Tennessee.

After granting Mrs. Roberts' Motion for Directed Verdict, the trial judge made a lengthy statement concerning the reasoning behind his decision. However, because this reasoning was not incorporated into the Court's Order it cannot be considered a finding of fact entitled to a presumption of correctness. *See Shelby v. Shelby*, 696 S.W.2d 360, 361 (Tenn. Ct. App. 1985) ("We do not review the Court's oral statements, unless incorporated in a decree, but review the Court's order and judgments for that is how a Court speaks.").

To determine the correctness of the trial court's granting of Mrs. Roberts' motion, we must review the evidence de novo to determine if the Co-Executors made out a prima facie case of the Agreement's validity by a preponderance of the evidence.

At trial, Co-Executors presented the testimony of four witnesses. First, Co-Executors called Mr. Simmons, who testified that he moved from Copper Hill, Tennessee, to Memphis, Tennessee, in 1968 to work for Mr. Roberts after Mr. Simmons' father was killed in a plane crash. Mr. Simmons and Mr. Roberts worked as partners in an auto parts business, until the business was sold in 1992. Mr. Simmons testified that he interacted with Mr. Roberts almost daily and that Mr. Roberts had an impeccable character for honesty. Further, Mr. Simmons stated that before his marriage to Mrs. Roberts, Mr. Roberts told Mr. Simmons on more than one occasion that he planned to execute a prenuptial agreement before the wedding. Additionally, Mr. Simmons testified that approximately one to two months after the wedding, Mr. Roberts showed him the Prenuptial Agreement and asked Mr. Simmons if he would like to read it. Mr. Simmons declined, and thus, only saw the first page of the Antenuptial Agreement. However, he could see that the Antenuptial Agreement "had a lot of other stuff paper-clipped to the back of [it.]"

Mr. Simmons then testified concerning the contents of Mr. Roberts' safe deposit box. Because Mr. Simmons knew that he was named an executor in Mr. Roberts' Will, after Mr. Roberts death Mr. Simmons traveled to the bank where Mr. Roberts' Will was kept in a safe deposit box. Mr. Simmons' daughter, April Austein (Ms. Austein), Mrs. Roberts, and Mrs. Roberts' daughter, Pat Long ("Ms. Long"), were also present when the contents of the safe deposit box were retrieved. Mrs. Roberts and Ms. Austein entered the bank while Mr. Simmons and Ms. Long remained outside. When Ms. Austein and Ms. Roberts exited the bank, Ms. Austein gave to Mr. Simmons an envelope in which the contents of the safe deposit box had been placed. Mr. Simmons testified that the envelope contained an Antenuptial Agreement and financial statements, Mr. Roberts' Will, a receipt for attorney services ("Receipt") signed by paralegal, Jan E. Leonard ("Ms. Leonard"), and some warranty deeds. Mr. Simmons stated that when he returned home that day he made an inventory of the envelope's contents. However, he never provided an inventory to Mrs. Roberts as she never asked for one.

Mr. Simmons also testified about the condition of the documents contained within Mr. Roberts' safe deposit box. Mr. Simmons stated that when he obtained possession of the safe deposit box's contents the "actual verbiage" of the Antenuptial Agreement "was stapled together," while the "big fold-out sheets that are the financial information were folded and paper-clipped to [the Antenuptial Agreement]." He reasoned that the financial information was not stapled to the Antenuptial Agreement "because if you stapled them you couldn't have unfolded them." **]**

Mr. Simmons also testified about gifts Mr. Roberts gave to Mrs. Roberts and her family. He said that before their marriage, Mr. Roberts bought Mrs. Roberts a piece of property located next to her daughter's home and also built Mrs. Roberts a 3,000 square foot house upon that property. Additionally, Mr. Roberts bought a car for Mrs. Roberts, a car for Mrs. Roberts' daughter, and a couple of cars for Mrs. Roberts' granddaughter. Likewise, he purchased homes for Mrs. Roberts' son and Mrs. Roberts' granddaughter.

Next, Mr. Simmons testified that he had "pretty much" a "total knowledge" of Mr. Roberts' financial circumstances for the period of 1993 to 1994 and that Mr. Roberts' financial statements in Exhibit 2 were an accurate representation of his financial condition.

The Co-Executors, in their proof-in-chief, also called Ms. Austein to testify. Ms. Austein stated that she had regular contact with Mr. and Mrs. Roberts as she worked part-time for Mr. Roberts. Ms. Austein noted that she had completed three years of college, and she talked to Mrs. Roberts each day she worked. Ms. Austein testified that she and Mrs. Roberts exchanged books, which they would later discuss. It was Ms. Austein's opinion that Mrs. Roberts "understood the books as well as [Ms. Austein] understood them."

Ms. Austein also testified concerning the retrieval of the contents of Mr. Roberts' safe deposit box. She stated that she entered the bank with Mrs. Roberts and either she or Mrs. Roberts put the contents of the safe deposit box into an envelope. She stated that she believed the bank officer left the room once the safe deposit box "was gotten down." Ms. Austein then testified that neither she, nor the bank officer, nor Mrs. Roberts, made an inventory of the box's contents. Ms. Austein took the envelope, containing the box's contents, directly outside to her father, Mr. Simmons. Ms. Austein testified that "the only reason that [she] kn[e]w that there was . . . an Antenuptial Agreement in the lock box was because [Mr. Roberts] told [her] it was going to be there."

Next, the Co-Executors called Jan Leonard Anderson ("Ms. Leonard") to testify before the trial court.[2] Ms. Leonard stated that in May of 1994 she was employed by attorney Dottie Pounders ("Ms. Pounders") and was qualified as a notary. When shown Exhibit 2, Ms. Leonard testified that the Antenuptial Agreement between Mr. and Mrs. Roberts "look[ed] like something that would have been drafted in [Ms. Pounders'] office." She also identified her signature on the Receipt and both

---

[2] We will refer to Jan Leonard Anderson by her maiden name of Ms. Leonard, the name she used when she notarized the Antenuptial Agreement.

hers and Ms. Pounders' signatures on the Antenuptial Agreement. However, she acknowledged that she could remember nothing about the day the Antenuptial Agreement was allegedly signed in Ms. Pounders' office and could not refer to a log of her notary work as she did not keep one at the time in question. She was also unable to recall either what Mr. or Mrs. Roberts looked like or what was said.

Ms. Leonard testified as to the process used in Ms. Pounders' office, in May of 1994, to notarize prenuptial agreements. Ms. Leonard stated that "[u]sually what I would do is the client would come in and usually meet with [Ms. Pounders] for a little while. And then when they were ready to sign it, I would go into the room and watch them sign it and then notarize it." Ms. Leonard further stated that she used this process every time she notarized a prenuptial agreement. However, Ms. Leonard admitted that she did not obtain identification of someone for whom she was notarizing a document, nor did Ms. Pounders explain, in Ms. Leonard's presence, the terms of an antenuptial agreement.

When asked whether she would notarize a single page of a document without the remainder of the document being present, Ms. Leonard answered, "I would never do that." She also stated that she "would never" notarize a signature that was not made in her presence. Likewise, she testified that she was unaware of any time that Ms. Pounders acted as a witness for a document without being present at the document's execution.

Finally, the following testimony was produced during redirect examination of Ms. Leonard by the Co-Executors:

> Q:        . . . [I]f someone has admitted that they signed a
> Prenuptial Agreement from your office . . . that you notarized in . . . May of
> 1994 . . . and Ms. Pounders signed as a witness, they've admitted that that's
> their signature, would they have had to have been in your office?
> A:        Yes.
> Q:        Would the whole document have had to have been
> together?
> A:        Yes.

The last witness to testify before the trial court was Ms. Pounders.[3] Although Ms. Pounders testified that she had no independent recollection of drafting the Antenuptial Agreement between Mr. and Mrs. Roberts, and she has no file for him, she believed she drafted the Agreement. Her belief was based on her identification of both her signature and Ms. Leonard's notary on the Agreement and the language used in the Agreement. Ms. Pounders stated that she has "never downloaded a document from the Internet in my entire practice[]" and, furthermore, that the form she developed

---

[3] Ms. Pounders' videotaped Deposition of July 11, 2007, was played before the trial court in its entirety, as Ms. Pounders was more than 100 miles from the courthouse on the trial date.

was not available for download from the Internet in 1994, as she doesn't believe her office even had access to the Internet at that time.

Ms. Pounders also testified concerning the process she used to draft and execute an antenuptial agreement. Ms. Pounders stated that she first meets, alone, with the client asking to have the antenuptial agreement drafted. At that meeting she explains what a prenuptial agreement is, the waivers contained within, the requirements for validity, and the information that must be disclosed. Ms. Pounders then begins drafting the antenuptial agreement, consulting with her client concerning the various drafts. At some time before execution, Ms. Pounders' client would provide information concerning the two estates involved. Ms. Pounders would briefly scan the information provided to ensure that it was, in fact, financial information, but would not further investigate whether the disclosures were accurate.

Ms. Pounders also testified pertaining to execution. She stated that after an antenuptial agreement's preparation, both parties to the agreement would meet at her office and sign the document in the presence of both herself and Ms. Leonard. Ms. Pounders did not provide legal advice to the non-client party, except to advise them that she did not represent them and to ask them if they had read the document. Additionally, when asked whether she would advise a non-client of his or her opportunity to seek counsel, Ms. Pounders answered:

> What I would have said - - what I typically say is "Please understand I do not represent you." I do not give any legal advice - - and this is a binding, legal document, and . . . as you see, in this document on the first page it says each of the parties declare that they've had the opportunity to consult with counsel and further declare that they've been advised that this Agreement is enforceable[.]

Ms. Pounders stated that "if at any time - - I've never had this happen, but if at any time a spouse said, 'I don't know that I'm comfortable executing this,' there would be no execution." When asked if her office had ever notarized a signature not made in the presence of the notary, Ms. Pounders responded, "No. I'm very . . . much a stickler about that . . . . It's significant to me that it be done by the book." Furthermore, she stated:

> I would not sign as a witness unless the signature was executed in my presence.
>
> . . . .
>
> I did witness this one, and . . . the only things I can be sure of is that I would not have signed my name unless those two persons who signed those signatures were in my office in front of me, and I also know that I made it very, very clear to my paralegal, Jan

Leonard, that she was never to notarize anybody's signature unless they signed in front of her.

Ms. Pounders also testified concerning the Receipt. Ms. Pounders stated that in 1994 she charged a flat fee of one thousand dollars to draft a prenuptial agreement. Then, when shown the Receipt, she stated that she recognized her secretary, Jan Leonard's, signature on such and expressed that the signature "indicates that I received a thousand dollars for services rendered from Mr. Roberts on May the 4th, 1994."

Although Mrs. Roberts did not testify at trial and her deposition has been stricken from the appellate record,[4] Mrs. Roberts' pleadings were before the trial court and, thus, we must consider them. In her pleadings, Mrs. Roberts acknowledged that it is her signature which appears on the Antenuptial Agreement. More specifically, in her Answer to Motion to Dismiss, Mrs. Roberts acknowledged she signed the Antenuptial Agreement when she pled as a defense that "[t]here was no disclosure to the wife prior to signing the Antenuptial" and "Husband unduly influenced the wife to sign the document[.]" Likewise, Mrs. Roberts admitted that she signed the Antenuptial Agreement, albeit at her home, in her Answer to Petition. However, in that same document Mrs. Roberts also "alleges that part of her signature on the pre-nuptial agreement was forged."

After a de novo review of the evidence presented to the trial court, we find that Appellants made out a prima facie case, by a preponderance of the evidence, of the Antenuptial Agreement's validity and enforceability.

First, Appellants' proof showed that Mrs. Roberts signed the Agreement in Ms. Pounders' office. Appellants presented the testimony of Ms. Pounders, who identified her own signature on the Agreement, and stated that her office would not have notarized, nor would she have witnessed Mrs. Roberts' signature, had the signature not been made in her presence. Additionally, Ms. Leonard acknowledged her own signature on the Agreement and testified that she would not have notarized Mrs. Roberts' signature if it had not been made in her presence. This testimony would be insignificant, as Ms. Leonard testified that in 1994 it was not Ms. Pounders' practice to verify the identification of the persons appearing in her office, except that Mrs. Roberts has acknowledged that it is her signature which appears on the Agreement.

Next, Appellants offered evidence that Mr. Roberts' financial information was attached to the Agreement when Mrs. Roberts executed such. Mr. Simmons testified that when Mr. Roberts showed him the Agreement, one to two months after his marriage to Mrs. Roberts, Mr. Simmons could see the Agreement "had a lot of other stuff paper-clipped to the back of [it]." Likewise, when he obtained possession of the safe deposit box's contents from his daughter he noted that the "actual

---

[4] The Deposition of Esther Roberts, listed as volume seven (7) of the appellate record was not properly included in the appellate records, as it was not part of the evidence presented before the trial court. Thus, it was struck in an Order Striking Exhibit 7 of the Record on Appeal, dated March 28, 2008.

verbiage" of the Agreement "was stapled together," while the "big fold-out sheets that are the financial information were folded and paper-clipped to [the Agreement]." Additionally, Ms. Leonard testified that she "would never" notarize a single page of a document without the remainder of the document being present and Ms. Pounders testified it was her practice to have her client bring in the required financial disclosure documents before an antenuptial agreement was executed. She further stated that generally she would attach to the antenuptial agreement, by staple or otherwise, either the original or a copy of the financial information provided by her client with "some clear designation of those documents as Exhibits to the Prenup."

The Agreement, itself, also provides evidence of disclosure. The Agreement's signature page is numbered "-6-" alerting signatories that the signature page is only part of a larger document. Furthermore, the Agreement states, in part:

> WHEREAS, a list of [Mr. Roberts'] property is attached hereto as Exhibit "A' and is incorporated herein by reference; and a list of [Mrs. Roberts'] property is attached hereto as Exhibit "B" and is incorporated herein by reference . . . .
> . . . .
> 4. Each of the parties has attempted to disclose to the other all of the property of material value which each owns as of the date of the execution of this Agreement. *Exhibits "A" and "B" attached to this Agreement, and made a part hereof*, reflect the assets of each party disclosed to the other. Each party warrants that the said exhibits were prepared by them or under their supervision in a good faith effort to disclose to the other all property of material value owned by him or her. Each party also acknowledges that he or she is familiar with the nature and extent of the financial holdings of the other.

(emphasis added). The above-mentioned Exhibits A and B were found paper- clipped to the Agreement, according to the evidence presented by Appellants. Exhibit A (Collective Exhibit 2) listed property Mr. Roberts owned jointly with his first wife as well as Mr. Roberts' accounts, Exhibit B (Collective Exhibit 2) listed Mrs. Roberts' separate property. Appellants' proof also shows that, after Mr. Roberts' death, the "big fold-out sheets," detailing Mr. Roberts' accounts, assets, liabilities, capital, and income, were found paper clipped to the Agreement.

Finally, Appellants presented proof regarding the accuracy of the financial information provided by Mr. Roberts. Mr. Simmons, Mr. Roberts' nephew and business partner for nearly twenty-five years, testified that he had "pretty much" a "total knowledge" of Mr. Roberts' financial circumstances for the period of 1993 to 1994 and that Mr. Roberts' financial statements in Exhibit 2 were an accurate representation of his financial condition at that time.

Based on a de novo review of the evidence presented by Appellants, we find that Appellants met their burden of establishing a prima facie case for the validity and enforceability of the Antenuptial Agreement by a preponderance of the evidence. Appellants presented evidence that

-12-

Mrs. Roberts signed the Antenuptial Agreement which referenced attached financial information and to which accurate financial disclosures were paper clipped. Accordingly, we find the trial court erred in granting Appellee's motion for involuntary dismissal.

## V. CONCLUSION

For the aforementioned reasons, we reverse the decision of the probate court and remand for further proceedings. Costs of this appeal are taxed to Appellee, Esther May Hammons Roberts, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.