IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 23, 2017 Session

## JERRY L. LAWRENCE, ET AL. v. CHATTANOOGA-HAMILTON COUNTY HOSPITAL AUTHORITY, ET AL.

Appeal from the Circuit Court for Hamilton County
No. 12-C-465        Ward Jeffrey Hollingsworth, Judge

———————————————

No. E2016-02169-COA-R3-CV

———————————————

This appeal involves an employment discrimination and retaliation lawsuit initiated by former employees of a hospital's Security Services Department. The trial court granted summary judgment to the hospital defendants on all claims, holding that plaintiff employees had failed to establish a prima facie case of discrimination or retaliation. The employees appeal. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and KENNY W. ARMSTRONG, JJ., joined.

John C. Harrison and Everett L. Hixson, III, Chattanooga, Tennessee, for the appellees, Chattanooga-Hamilton County Hospital Authority, d/b/a Erlanger Health Systems, Charlesetta Woodard Thompson and Gregg Gentry.

Stuart F. James, Chattanooga, Tennessee, for the appellants, Jerry L. Lawrence, Gary Talley, Harold Holliday, Kenneth R. Cookston, Ronald J. Capetz, Gary C. Avans, and Rodney J. Patton.

## OPINION

## I. BACKGROUND

On April 30, 2011, the Chattanooga-Hamilton County Hospital Authority, d/b/a Erlanger Health Systems and its executive management team ("Erlanger") laid off the over 20-member police force, the Erlanger Security Services Department ("the SSD"

hereinafter, but also referred to as the "Erlanger Police Department" by the appellants Jerry L. Lawrence, Gary Talley, Harold Holliday, Kenneth R. Cookston, Ronald J. Capetz, Gary C. Avans, and Rodney J. Patton ("Officers")). The SSD was a fully commissioned and POST-certified police department with law enforcement and arrest authority. Earlier in 2011, Erlanger decided to outsource its security services to Walden Security ("Walden") beginning May 1, 2011. Appellant Rodney Patton was the supervisor and/or chief of the SSD at the time of the layoff. All other appellants were employees of the SSD.

Erlanger has an extensive history of outsourcing departments not considered within its "core competencies." Between 1997 and 2011, Erlanger outsourced its Rehab Services Department, LifeForce helicopter service, and Information Technology Department. In 2009, Erlanger laid off most of the employees in its Construction Services Department, offering severance packages. After this lawsuit was initiated, Erlanger outsourced its Dietary Department and the Environmental Services Department in 2014. The decision-makers involved, leading up to and overseeing the outsourcing decision for the SSD, included CEO Jim Brexler, COO Charlesetta Woodard-Thompson, CLO Dale Hetzler, Corporate Preparedness Officer ("CPO") Debbie Shepherd, Senior Vice President ("SVP") of Human Resources Gregg Gentry, Vice President ("VP") of Governmental and Community Affairs Doug Fisher, and CFO Britt Tabor.

The record reveals that Erlanger's top management began discussing concerns about the adequacy of the SSD in the mid to late 2000s. Sworn testimony by upper level management, including SVP Gentry and COO Woodard-Thompson, revealed difficulties with hiring and understaffing despite the department being adequately budgeted. Erlanger augmented the SSD with off-duty Chattanooga Police Department officers to make up for the shortfall. Outsourcing discussions began as early as 2008. According to his Declaration, SVP Gentry spoke with Appellant Patton in 2008 about outsourcing. However, whether or not this conversation occurred is disputed by Patton's Affidavit.

In fall 2009, VP Fisher and CLO Hetzler informed upper Erlanger management that Dan Johnson, the Chattanooga Mayor's Chief of Staff, had informed them that the city of Chattanooga would no longer commission the SSD officers (required in order for them to carry firearms). VP Fisher had a similar conversation with Allen Branum, Chief Deputy of the Hamilton County Sheriff's Department, although it is not clear whether that conversation dealt with Hamilton County commissioning the SSD officers or the city doing so. VP Fisher communicated this information to management, further increasing concern over Erlanger's ability to maintain an internal police force.

In late 2009 and into early 2010, Erlanger outsourced its annual facilities security review to Security Assessments International ("SAI"). SAI's review recommended *against* outsourcing security and for keeping an internal police force. The report noted, inter alia:

> The Erlanger Police Department's personnel have done an excellent job in providing protection for Erlanger's patients, visitors, and employees at all EHS locations. This is noteworthy, taking into consideration the limited number of staff and resources currently available. This is due, in part to the fact that the hospital is the beneficiary of knowledgeable, experienced, and dedicated police and security personnel who have been able to establish, implement and manage an acceptable security program despite these budgetary and manpower constraints . . . .
>
> The Department is staffed below industry standards for the size, location, and criminal demographics of the Erlanger Health System . . . .
>
> All Security Guard positions should be replaced with armed police officers as the Security Guard position becomes vacant. Only armed police officers should be utilized in the protection of Erlanger Health System people and property.

SAI recommended increasing the number of officers beyond the current number presently in the budget.

Despite SAI's recommendations, on April 12, 2010, after discussions about outsourcing the SSD, Erlanger contracted with Walden to both manage the SSD and to augment its ranks with Walden's own unarmed, non-commissioned officers. The decision-makers for this agreement included CEO Brexler, COO Woodard-Thompson, CLO Hetzler, CPO Shepherd, SVP Gentry, and Pat Charles, Director of Human Resources. The practical effect of the management agreement between Walden and Erlanger meant that Walden would manage and augment the SSD from April 2010 until the end of April 2011.

By the summer of 2010, a committee consisting of COO Woodard-Thompson, CLO Hetzler, CPO Shepherd, SVP Gentry, and VP Fisher continued outsourcing discussions followed by a decision to fully outsource the SSD and seek bidders. This decision was also communicated to and approved by CEO Brexler, and it involved CFO Tabor. The Declaration of SVP Gentry and the deposition of COO Woodard-Thompson provide that the reasons for outsourcing included Erlanger's inability to properly manage a security force; Erlanger's inability to properly staff the SSD in its current form and the necessity for increasing the SSD's size as recommended by SAI; and the possibility that the SSD's officers would lose their commissions, making managing a security force even more difficult in the future.

In December 2010, Erlanger selected Walden, from among several other bidders, for full outsourcing of the hospital's security. The selection committee consisted of COO Woodard-Thompson, CPO Shepherd, and six other individuals not involved with the initial outsourcing decision. While Walden's bid required budget increases for the SSD, this was because Walden's proposal required a greater number of employees than presently employed. The selection committee sent the proposal to CEO Brexler who subsequently submitted it to Erlanger's Board of Trustees. On March 21, 2011, Erlanger's Budget and Finance Committee of the Board of Trustees approved the agreement with Walden. The full Board of Trustees approved the agreement unanimously three days later. All the SSD employees were laid off on April 30, 2011.

The SSD employees were offered 12-week severance packages that released Erlanger of all liability and removed from the employee all rights to sue Erlanger. Seven former members of the SSD accepted the packages, including two officers in this case, Kenneth Cookston and Gary Talley. Four officers, Capetz, Avans, Lawrence, and Holliday, filed unpaid wage claims with the Department of Labor after their termination.[1] Mr. Capetz filed his claim on May 25, 2011, and the other three appellants filed their claims in August 2011.

All the SSD employees were offered the chance to apply for positions with Walden. No officers in this case applied. Eight other former employees did apply, and Walden made seven offers, six of which were accepted. Five ended up working for Walden after one former employee failed to complete training. The SSD employees were not guaranteed that they would receive similar or the same pay or benefits while working for Walden as they had received as employees of Erlanger.

On April 5, 2012, Officers filed this lawsuit. Appellants Talley, Holliday, Lawrence, Cookston, Capetz, and Avans alleged employment discrimination on the basis of age under the Tennessee Human Rights Act ("THRA"). Appellant Patton alleged employment discrimination on the basis of race under THRA. Appellants Lawrence, Holliday, Capetz and Avans alleged retaliatory discharge for filing unpaid wage claims with the Tennessee Department of Labor. Officers also asserted violations of the Tennessee Wage Regulation Act, but that claim was dismissed by the trial court and is not raised on appeal. Erlanger filed for summary judgment on all other claims on May 20, 2016. After several delays, the trial court held oral arguments on the motion for summary judgment on September 12, 2016.

Erlanger argued in its motion for summary judgment that Appellants Lawrence, Holliday, Capetz, and Avans could not prove a *prima facie* case of retaliation because

---

[1] The claim regarded "the failure of Erlanger to properly compensate the plaintiffs and to give them time to take a break for lunch throughout the course and scope of their employment."

they were fired before they submitted unpaid wage complaints to the Tennessee Department of Labor. Erlanger also asserted that the claims of Appellants Cookston and Talley were barred by the releases they signed when they accepted a severance agreement with Erlanger. Erlanger further claimed that Appellant Patton could not prove a *prima facie* case of race discrimination because he was not replaced or treated differently than a non-minority; all Officers were terminated. Erlanger argued similarly that the other employees cannot prove a *prima facie* case of age discrimination because they were all terminated together and, as a result, none was replaced by a younger person or treated differently than a younger person.

Officers argued primarily that Appellant Patton's Affidavit and the interrogatory answers of Appellants Cookston and Holliday raise material factual disputes that call the entire Gentry Declaration into question. Officers make no effort to show that they are trying to prove a *prima facie* case of discrimination. Their primary evidence at the summary judgment stage consisted of Patton's many assertions in an affidavit that Officers allege undermines Erlanger's arguments and rationale for outsourcing and the layoffs. The Patton Affidavit included the following pertinent assertions and statements of Patton himself:

> At no time during my discussions with anyone in management was an issue raised as to the sufficiency of the police force at Erlanger or the ability to maintain an adequate police force to maintain security at the hospital. I did participate in discussions that involved hiring Walden to help the police department in a support role with the police department providing the armed security that [it] had been providing at Erlanger. . . .
>
> . . . There was no issue surrounding the commissions that I am aware of. Moreover, each of the police officers or plaintiffs in this case continue to hold their commissions and each is post certified and was able to carry a firearm to provide armed security. . . . At no time did anyone raise any issues about the lack of commissions being provided to the police force in Erlanger. . . .
>
> * * *
>
> To my knowledge none of the Erlanger security guards providing security are properly armed, post-certified, or commissioned by the city of Chattanooga to provide police protection. Instead, off-duty Hamilton County Sheriff's Department inadequately provide that protection and both the

cost of having the Sheriff's Department and Walden at the hospital are much more expensive and cost the hospital more money than it would have cost the hospital to adequately provide security through the Erlanger Police Department . . . .

. . . I never felt that the police force could not provide the law enforcement that is needed at the hospital. . . .

I raised concerns . . . that hiring a security company would eliminate the ability to make arrests on the Erlanger campus. . . . [The security company] would not be able to stop a suspect for questioning, would not be able to perform the same duties as a police force . . . .

I am aware that Erlanger has outsourced other departments and other services at the hospital. When making such outsourcing Erlanger has always provided for the employees to either be employed by the outsourced service agency at the same pay and with the same benefits as they enjoyed as employees or, alternatively, Erlanger would accommodate those employees by providing them with benefits and retirement as an employee of Erlanger.

Erlanger did not make the same offer to me or any of my police officers . . . . The officers and I were treated differently than other employees who were the victims of outsourcing by Erlanger for other services.

. . . I have reviewed the Erlanger security survey and I have come to the conclusion that Erlanger acted in contravention to that survey and its recommendations. . . . I am aware that the budgetary concerns arising from Walden providing security have increased the cost of maintaining security and ha[ve] not been as cost-effective nor effective as a Police Department.

. . . It is my opinion that those officers were fired because of their age and that those officers and I were treated differently because of our race and/or age. Erlanger had no substantial justification for spending more money to outsource security for an unarmed security agency to provide security at the hospital which is contrary to the security survey . . . .

* * *

> Based upon what I know, my experience, and my knowledge of the facts and circumstances of this claim Erlanger made a decision to force out police officers who were about to vest in their retirement plans, who were over the age of 40, or black, and who are otherwise older . . . .

Patton asserts that Erlanger's management never told him about their various concerns regarding the adequacy of the SSD. The SSD officers' commissions were not scheduled to expire until 2050, despite SVP Gentry's concerns to the contrary. Patton states that he had no knowledge or belief that commissions were being threatened. Erlanger's management never broached the issue with him. Patton notes that he was never involved in outsourcing discussions, including the 2008 discussion between Patton and SVP Gentry alleged in the Gentry Declaration. He was never made aware of the possibility of outsourcing except for the supplemental work Walden did for Erlanger from April 2010 to April 2011. According to Patton, Erlanger's management, including CPO Shepherd, made repeated statements that the SSD would never be outsourced and that the SSD jobs were safe. After the outsourcing decision was made, Patton was not informed of the reasons for the outsourcing.

Officers also relied on answers to interrogatories by Appellants Holliday and Cookston. In response to the interrogatory, "State the basis for your contention that [COO] Charlesetta Woodard Thompson is individually liable to you," Appellant Holliday stated:

> Because she made statement in 2011 that the police officers at Erlanger had lost commission privileges to carry a weapon and this statement was not true. The City Commission cards are valid through 2050. She also informed us that we would remain employed at the hospital in a meeting with [COO] Charlesetta, [SVP] Gregg Gentry, and CPO Debbie Shepherd. We understood we would be doing the police portion of the work with Walden acting as back up for security purposes.

In response to interrogatory number 11, "State your basis for your contention that defendant Gregg Gentry is individually liable to you," Appellant Holliday responded:

> Because I feel that I was misled by him in our meetings regarding my job status. He misled us during meetings throughout the year we were training Walden Security. Mr. Gentry told us you "guys have nothing to worry about, everything is going to be OK." Mr. Gentry never informed us of the intention to have Walden replace us as a police force. Despite his representations to the contrary, all of the police

officers were replaced by Walden Security despite recommendations in a written security survey to keep the police force on the various campuses. I feel that Gregg Gentry made misrepresentations about our status and whether we would be a part of an ongoing police force with a security company providing security support.

In response to interrogatory number 2 sent to Appellant Cookston, "State the basis for your contention . . . that your employment at Erlanger was terminated 'due to age,'" he responded:

Because the police officers at Erlanger were in their 50s, 60s and 70s. The decision to hire Walden was also contrary to the report given to the hospital by the security survey which recommended keeping us on as a police force. I also possessed my City Certification which is good until 2050. I was also a post certified police officer and became post certified in 1991. I was not given an explanation for my termination and based on the fact that I and the remaining officers who worked with me were older led me to the belief that we were being terminated because of age and the hospital wanting a younger security force in place overall. Walden is not a police department, it is a security agency.

In sum, these interrogatories reveal Officers' subjective beliefs that COO Woodard-Thompson said the SSD commissions were at risk despite all current commissions being valid until 2050, that Walden was only supplementing the SSD and not replacing it entirely, that SVP Gentry provided assurances that the SSD jobs were not at risk, that Erlanger management did not provide explanations for termination to Officers, and that Erlanger acted against the recommendations of the SAI review and with a goal of getting rid of an aging work force in its decision to terminate all employees of the SSD.

The trial court granted Erlanger's motion for summary judgment on all claims. The court held that Appellants Cookston and Talley's age discrimination claims were barred by accepting severances and signing releases on June 13, 2011. The trial court noted: "The releases signed by these Plaintiffs state[] that the employee '. . . releases Erlanger . . . from any and all claims, whether known or unknown, causes of action . . . that arise out of the employee's employment, or termination of the employee's employment with Erlanger. . . .'" The trial court further found that Capetz, Avans, Lawrence, and Holliday's retaliation claims were filed after their termination, May 2011 for Capetz and August 2011 for the other three, and, subsequently granted summary judgment on the retaliation claims. The court observed: "It is, obviously, impossible to

- 8 -

fire someone for something that has not happened."

The remaining age and race discrimination claims were dismissed because Officers failed to prove a *prima facie* case of discrimination under the *McDonnell-Douglas* analysis as followed by *Yount v. FedEx Express*, No. W2015-00389-COA-R3-CV, 2016 WL 1056958, at *15–16 (Tenn. Ct. App. Mar. 17, 2016). Specifically, Officers failed to establish the fourth prong of the analysis for both types of discrimination. For age discrimination, this prong requires that the worker to be replaced by or treated differently than a younger worker. For racial discrimination, it requires the worker to be replaced by or treated differently than a non-minority. The court found it was undisputed that all Officers were fired simultaneously and none were replaced. Thus, it concluded that a *prima facie* case could not be proven in both instances. The trial court held that Erlanger had negated an essential element of Officers' claim and that judgment as a matter of law was appropriate. Further, the court found any facts or factual disputes raised by Officers' affidavit or interrogatory answers to be immaterial to their legal claims. Additionally, it found that Officers' evidence raised no genuine issues of material fact regarding pretextual reasons for Erlanger's outsourcing decision.

## II. ISSUES

We have consolidated the issues raised on appeal as follows:

> (1) Whether the trial court erred in granting summary judgment on Appellant Patton's racial discrimination claim?
>
> (2) Whether the trial court erred in granting summary judgment on Officers' age discrimination claims, including claims of Officers who accepted severance packages and signed releases?
>
> (3) Whether the trial court erred in granting summary judgment on Officers' retaliation claims?
>
> (4) Whether the trial court erred in granting summary judgment, in part, on hearsay and hearsay statements of others?

## III. STANDARD OF REVIEW

A trial court's ruling on a motion for summary judgment is reviewed de novo, with no presumption of correctness. *Russell v. HSBC Mortgage Servs., Inc.*, No. M2015–

00197–COA–R3–CV, 2016 WL 1588091, at *11 (Tenn. Ct. App. Apr. 15, 2016) (citing *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). In doing so, "we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Greeze v. Tennessee Farmers Mut. Ins. Co.*, No. E2016-00792-COA-R3-CV, 2017 WL 1163680, at *4 (citing *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013)).

Whether a statement is hearsay and whether it fits one of the exceptions to the hearsay rule are questions of law and are subject to *de novo* review. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015), *cert. denied*, 136 S. Ct. 335 (2015).

## IV. DISCUSSION

The Tennessee Supreme Court in *Rye* stated our standard of review for summary judgment as follows:

> Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment *de novo*, without a presumption of correctness.
>
> * * *
>
> [I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. . . . The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.

*Rye,* 477 S.W.3d at 250, 264–65 (emphasis in original). In determining whether summary judgment was properly granted,

> [w]e must view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in

- 10 -

the nonmoving party's favor. *Luther v. Compton*, 5 S.W.3d 635, 639 (Tenn. 1999); *Muhlheim v. Knox. Cnty. Bd. of Educ.*, 2 S.W.3d 927, 929 (Tenn. 1999). If the undisputed facts support only one conclusion, then the court's summary judgment will be upheld because the moving party was entitled to judgment as a matter of law. *See White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998); *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

*Demastus v. Univ. Health Sys.*, No. E2016-00375-COA-R3-CV, 2017 WL 829815 at *3 (Tenn. Ct. App. Mar. 2, 2017) (quoting *Wells Fargo Bank, N.A. v. Lockett*, No. E2013-02186-COA-R3-CV, 2014 WL 1673745, at *2 (Tenn. Ct. App. Apr. 24, 2014).

### A. *McDonnell-Douglas* Burden-Shifting Analysis

The THRA was enacted with the purpose of protecting individuals in Tennessee from discrimination on the basis of "race, creed, color, religion, sex, age or national origin in connection with employment . . . ." Tenn. Code Ann. § 4-21-101(a)(3) (2017). Under the THRA, it is "a discriminatory practice for an employer to . . . discharge any person . . . because of such person's race . . . [or] age . . . ." Tenn. Code Ann. § 4-21-401 (2017). "The THRA was modeled on the federal anti-discrimination laws, and 'Tennessee's courts regularly consult the decisions of their federal counterparts for guidance when called upon to construe and apply the Tennessee Human Rights Act.'" *Vawter v. E. I. du Pont de Nemours & Co.*, No. W2015-00874-COA-R3-CV, 2016 WL 3228129, at *3 (Tenn. Ct. App. Jun. 2, 2016) (quoting *Wilson v. Rubin*, 104 S.W.3d 39, 48 (Tenn. Ct. App. 2002)).

As of June 10, 2011, the General Assembly's addition of subsection (e) in Tennessee Code Annotated section 4-21-311 appears to re-introduce the federal *McDonnell Douglas* burden-shifting analysis in employment discrimination cases. Tenn. Code Ann. § 4-21-311 (2017); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Section (e) reads in pertinent part:

In any civil cause of action alleging a violation of this chapter or of § 8-50-103, the plaintiff shall have the burden of establishing a prima facie case of intentional *discrimination or retaliation*. If the plaintiff satisfies this burden, the burden shall then be on the defendant to produce evidence that one (1) or more legitimate, nondiscriminatory reasons existed for the challenged employment action. The burden on the defendant is one of production and not persuasion. If the defendant produces such evidence, the presumption of

> discrimination or retaliation raised by the plaintiff's prima facie case is rebutted, and the burden shifts to the plaintiff to demonstrate that the reason given by the defendant was not the true reason for the challenged employment action and that the stated reason was a pretext for illegal discrimination or retaliation. The foregoing allocations of burdens of proof shall apply at all stages of the proceedings, *including motions for summary judgment.* The plaintiff at all times retains the burden of persuading the trier of fact that the plaintiff has been the victim of intentional discrimination or retaliation.

Tenn. Code Ann. § 4-21-311 (2017) (emphasis added). In the same bill, the General Assembly also simultaneously added section 50-1-801, providing the same burden of proof for common law retaliatory discharge claims. Tenn. Code Ann. § 50-1-801 (2017). Further, our appellate courts have interpreted that the Tennessee Supreme Court's decision in *Rye* essentially and indirectly abrogated the Court's prior holding in *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777 (Tenn. 2010), that had previously discarded the *McDonnell Douglas* framework for employment discrimination and retaliation causes of action in Tennessee. *See Yount*, 2016 WL 1056958, at *7 (citing *Rye*, 477 S.W.3d at 264).

As such, we recognize that the *McDonnell Douglas* burden-shifting analysis is appropriate for THRA discrimination and common law retaliatory discharge claims, and, therefore, Officers in the instant case were required to establish a *prima facie* case of discrimination and/or retaliation to survive summary judgment. Tenn. Code Ann. §§ 4-21-31, 50-1-801 (2017); *Rye*, 477 S.W.3d at 264; *Yount*, 2016 WL 1056958, at *15-16.

### B. Racial Discrimination Claim

Erlanger contends that Officers did not and cannot prove a *prima facie* case of racial discrimination because Appellant Patton was not replaced or treated differently than a non-minority. Erlanger points out that all Officers were fired simultaneously, including all non-minority employees. Thus, Erlanger asserts summary judgment was properly granted on Appellant Patton's claim.

Alternatively, Erlanger argues that it had legitimate, non-discriminatory reasons for the decision to terminate all Officers, including Appellant Patton. Namely, Erlanger asserts that it had concerns with its ability to manage a security force, concerns over its inability to consistently staff the SSD, and a concern over the effectiveness of the understaffed SSD.

Officers do not broach the subject of establishing a *prima facie* case of discrimination. They instead assert that Appellant Patton's Affidavit and the

interrogatory responses of Cookston and Holliday raise genuine issues of fact as to whether Erlanger's stated reasons for firing Patton were a pretext for racial discrimination.

Due to the THRA's stated purpose to "[p]rovide for execution within Tennessee of the policies embodied" in federal civil rights laws, we frequently look to federal case law when analyzing a claim under the THRA. Tenn. Code Ann. § 4-21-101(a)(1); *Ferguson v. Middle Tennessee State Univ.*, 451 S.W.3d 375, 380-81 (Tenn. 2014); *Weber v. Moses*, 938 S.W.2d 387, 390 (Tenn. 1996). To establish a *prima facie* case of racial discrimination under *McDonnell Douglas*, a plaintiff may either present direct evidence of intentional discrimination on the part of the defendant or show the existence of circumstantial evidence which creates an inference of discrimination. *Talley v. Bravo Pitino Restaurant, LTD.*, 61 F.3d 1241, 1246 (6th Cir. 1995) (citing *McDonnell Douglas Corp*, 411 U.S. at 802). Because the record before us is devoid of any direct evidence of racial discrimination, we examine the latter, as did the trial court.

To establish an inference or a circumstantial case of racial discrimination, plaintiffs must show that:

(1) they are members of a protected class;

(2) they were qualified for their jobs;

(3) they suffered adverse employment actions; and

(4) they were replaced by individuals outside of their protected class, or treated less favorably than similarly situated employees outside of their protected class.

*Walker v. Wholesale, Inc.*, No. 3:12-cv-0595, 2013 WL 4402912, at *9 (M.D. Tenn. Oct. 2, 2013) (citing *Talley*, 61 F.3d at 1246); *see also Cobb v. State*, No. M2014-01755-COA-R3-CV, 2017 WL 1404341, at *7 (Tenn. Ct. App. Apr. 17, 2017) (citing *Hawthorne v. Univ. of Tennessee Health Sci. Ctr.*, 203 F. Supp. 3d 886, 891 (E.D. Tenn. 2016); *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008)).

If the non-moving party fails to establish a *prima facie* case, when either the movant either negates an essential element of the plaintiff's claim or shows the non-movant's evidence is insufficient to establish an essential element of the claim, summary judgment should be granted. Tenn. Code Ann. § 20-16-101 (2017); *See Rye*, 477 S.W.3d at 264–65.

If a plaintiff establishes a *prima facie* case of racial discrimination, this creates a presumption that the defendant has unlawfully discriminated against the plaintiff, and the

- 13 -

burden then shifts to the defendant "to articulate a legitimate, non-discriminatory reason for the discharge." *Walker*, 2013 WL 5502912, at \*9 (citing *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004)). If the defendant carries this burden, "plaintiffs must then show that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *DiCarlo*, 358 F.3d at 414). However, the ultimate burden of persuasion rests with the plaintiff. *Id.* (citing *Talley*, 61 F.3d at 1246).

The record before us reveals that Officers failed to establish a *prima facie* case of racial discrimination. Appellant Patton could not show that he was replaced or treated differently than a non-minority as all the employees were terminated. Accordingly, summary judgment was properly granted to Erlanger on this claim.

### C. Age Discrimination & Releases

Erlanger asserts that Officers did not and cannot establish a *prima facie* case of age discrimination because all the employees were fired simultaneously, and, thus, none were replaced by a younger person. As such, Erlanger contends that the grant of summary judgment on Officers' age discrimination claims was proper. Additionally, Erlanger asserts that the trial court properly granted summary judgment on the age discrimination claims of Appellants Cookston and Talley because they accepted severance packages and signed releases which barred them from later suing Erlanger.

Alternatively, Erlanger argues that it had legitimate, non-discriminatory reasons for the decision to terminate all employees of the SSD, including Officers. Namely, Erlanger asserts it had concerns with its ability to manage a security force, concerns over its inability to consistently staff the SSD, and a concern over the effectiveness of the understaffed SSD.

Erlanger contends that there was no discussion of the age or demographic make-up of the existing security force between Woodard-Thompson and Shepherd:

> Q: Did Debbie [Shepherd] raise with you any issues regarding the age and makeup of the security department after the report was issued by Security Assessments International?
>
> A: I don't ever remember having a discussion about the age of the people in the department.
>
> Q: What about the experience of the people in the department?
>
> A: I don't remember having a specific discussion about the experience of the people in the department.

- 14 -

Q:  All right.

A:  Discussions mostly centered around getting a full staff.

The only discussion was whether the security personnel were qualified for the position, as defined by the Erlanger position description.

Similar to their racial discrimination claim, Officers do not attempt to show that they established a *prima facie* case of age discrimination.  Instead, they rely on Patton's Affidavit and Cookston and Holliday's interrogatory answers to assert that Erlanger's reasons for terminating Officers were pretextual.  In their brief, Officers contend that Erlanger sought to get rid of "an aging Police Department" that would cost the hospital in retirement expenses and health insurance.

Much like in a racial discrimination case, a plaintiff may prove his or her case for age discrimination under the THRA either through a direct or an indirect method of proof. *Ogg v. Campbell County Bd. of Educ.*, No. E2009-02147-COA-R3-CV, 2011 WL 13165339, at *5 (Tenn. Ct. App. Sep. 20, 2011) (citing *Wilson v. Rubin*, 104 S.W.3d 39, 49 (Tenn. Ct. App. 2002)). Because the record is bare of any "evidence of an employer's conduct or statements which, if believed, requires a conclusion that unlawful discrimination was a substantial motivating factor for the employer's actions," we examine the indirect method, as did the trial court. *Id.* (quoting *Wilson*, 104 S.W.3d at 49) (internal quotations omitted).

To establish a *prima facie* case of age discrimination via indirect or circumstantial proof, a plaintiff must show:

> (1) he was at least 40 years of age at the time of the alleged discrimination, i.e., "a member of a protected class;"
>
> (2) he was subjected to adverse employment action;
>
> (3) he was qualified for the position; and
>
> (4) he was replaced by a substantially younger person.

*Stewart v. Cadna Rubber Co.*, No. W2013-00670-COA-R3-CV, 2014 WL 1235993, at *8 (Tenn. Ct. App. Mar. 26, 2014) (citing *Kremp v. ITW Air Mgmt.*, No. 11-3235, 478 Fed. Appx. 931, 2012 WL 1237790, at *1 (6th Cir. 2012)); *see also Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014) (citing *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 529 (6th Cir. 2007)).

- 15 -

Additionally, when an employee is terminated as a part of an employer's reduction in force ("RIF"), the employee must meet a higher standard of proof to establish a *prima facie* case of age discrimination. *Pierson*, 749 F.3d at 536–37 (citing *Barnes v. GenCorp*, 896 F.2d 1457, 1465 (6th Cir. 1990)). The employee must provide "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled [him] out . . . for discharge for impermissible reasons." *Id.* (quoting *Barnes*, 896 F.2d at 1465). The *Pierson* court provided the analysis that must be undertaken to determine if an employee was terminated as a part of a RIF:

> A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

*Pierson*, 749 F.3d at 537 (quoting *Barnes*, 896 F.2d at 1465). If a plaintiff cannot prove a *prima facie* case under either standard, summary judgment is warranted. Tenn. Code Ann. §§ 20-16-101 (2017); 4-21-311 (2017).

If a plaintiff establishes a *prima facie* case of age discrimination, the burden shifts to the defendant to "articulate a legitimate non-discriminatory business reason for the challenged employment action." *Ogg*, 2011 WL 13165339, at *5 (citing *Dennis v. White Way Cleaners, L.P.*, 119 S.W.3d 688, 694 (Tenn. Ct. App. 2003)). After a defendant has carried his or her burden by articulating a non-discriminatory reason for the discharge, the burden shifts back to the plaintiff to present evidence that defendant's reasons were pretextual. *Id.* (citing *Versa v. Policy Studies, Inc.*, 45 S.W.3d 575 (Tenn. Ct. App. 2000)). To establish that the reasons were pretextual, the employee "may show that the employer was more likely than not motivated by a discriminatory reason or that the employer's explanation was not credible." *Ogg*, 2011 WL 13165339, at *5 (citing *Barnes v. Goodyear Tire and Rubber Co.*, 48 S.W.3d 698, 708 (Tenn. 2000) *abrogated on other grounds by Gossett*, 320 S.W.3d 777 (Tenn. 2010)).

The record before us reveals that Officers failed to establish a *prima facie* case of age discrimination. They could not show that they were replaced by younger persons or treated differently than younger persons because they were all terminated together. The trial court appropriately awarded summary judgment to Erlanger on this ground.

## C. Retaliation Claims

Erlanger contends that Appellants Capetz, Avans, Holliday, and Lawrence cannot establish a *prima facie* case of common law retaliatory discharge because they filed their unpaid wage claims with the Tennessee Department of Labor *after* they were terminated. These Officers conceded at trial that they filed their claims after their termination. One filed in May 2011, and the other three filed in August 2011. It is undisputed that all four employees were terminated at the end of April 2011. Puzzlingly, Officers argue that the Patton Affidavit and Holliday and Cookston's interrogatory answers create sufficient factual disputes regarding whether these employees established a *prima facie* case of retaliatory discharge.

The employment-at-will doctrine is "a bedrock of Tennessee common law and is a fundamental principle controlling the employer-employee relationship." *Richmond v. Vanguard Healthcare Servs., LLC*, No. M2014-02461-COA-R3-CV, 2016 WL 373279, at *4 (Tenn. Ct. App. Jan. 29, 2016) (quoting *Williams v. City of Burns*, 465 S.W.3d 96, 108 (Tenn. 2015)) (internal quotations omitted). Common law retaliatory discharge causes of action are an important, but narrow, exception to the employment-at-will doctrine. *Williams v. Greater Chattanooga Pub. TV Corp.*, 349 S.W.3d 501, 513 (Tenn. Ct. App. 2011). Plaintiffs pursuing a common law retaliatory discharge claim are required to establish a *prima facie* case of retaliation:

> (1) that an employment-at-will relationship existed;
>
> (2) that the employee was discharged;
>
> (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and
>
> (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy

*Id.* 349 S.W.3d at 513 (Tenn. Ct. App. 2011); *see also Crews v. Buckman Labs. Int'l,* 78 S.W.3d 852, 862 (Tenn. 2002) (citations omitted).

Unlike a statutory retaliatory discharge claim, a plaintiff need only show that the protected action was a *substantial* factor in the employer's decision. *Richmond*, 2016 WL 373279, at *9 (citing *Williams*, 465 S.W.3d at 108). A plaintiff's "subjective beliefs, mere speculation, or testimony that the employee can think of no other reason for the

discharge cannot, in and of themselves, create the requisite causal relationship." *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 391 (Tenn. Ct. App. 2006) (citing *Reed v. Alamo Rent-A-Car, Inc.*, 4 S.W.3d 677, 685 (Tenn. Ct. App. 1999)). Further, a plaintiff "cannot rely on the mere short passage of time between the filing of a . . . claim and subsequent termination to prove a prima facie case of retaliation." *Id.* (citing *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 648 (Tenn. 1995)). When a plaintiff fails to demonstrate a *prima facie* case, summary judgment should be granted to the defendant. Tenn. Code Ann. §§ 20-16-101; 50-1-801 (2017).

However, if a plaintiff does establish a *prima facie* case, the burden shifts to the defendant to provide a legitimate, non-discriminatory, non-pretextual reason for the discharge. *Provonsha v. Students Taking a Right Stand, Inc.*, No. E2007-00469-COA-R3-CV, 2007 WL 4232918, at *2 (Tenn. Ct. App. Dec. 3, 2007) (citations omitted). If a defendant meets this burden, the burden of proof shifts back to the plaintiff to show the defendant's reason was not the true reason for the discharge and that the stated reason was pretext. *Id.*; Tenn. Code Ann. § 50-1-801 (2017). To meet this burden, a plaintiff "must show by admissible evidence either '(1) that the proffered reason has no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate the discharge.'" *Provonsha*, 2007 WL 4232918, at *4 (quoting *Forrest v. City of Ridgetop, et al.*, No. M2002-01176-COA-R3-CV, 2003 WL 21954195, at *2 (Tenn. Ct. App. Aug. 15, 2003) *overruled on other grounds by Williams*, 465 S.W.3d at 108).

The record before us clearly reveals that Officers failed to establish a *prima facie* case of retaliation. For five Officers, the complaints they cite as the basis for retaliation occurred after they were terminated. Cookston and Talley's claims are barred because they accepted severance agreements and signed releases. Thus, summary judgment was correctly granted to Erlanger on this issue.

### D. Hearsay

Officers contend that portions of the Gentry Affidavit are inadmissible as hearsay and should not have been considered by the trial court. Officers attack the Gentry Affidavit's assertion that city and county officials (Dan Johnson and Allen Branum) told Erlanger management (CLO Hetzler and VP Fisher) that the city and county were going to cease issuing commissions to the SSD. The affidavit further asserted that CLO Hetzler and VP Fisher subsequently provided that information to SVP Gentry and other Erlanger management staff. Officers point out that VP Fisher, CLO Hetzler, Chief of Staff Johnson, and Chief Deputy Branum did not testify or submit affidavits; their alleged conversations, however, are stated in the Gentry Affidavit.

Erlanger argues that hearsay does not include statements offered for the purpose of establishing intent, establishing the statement's effect on the recipient, or explaining the

reasons for the recipient's behavior. Further, Erlanger asserts that the statement in question was a statement of intention or anticipated future events; its literal truth is unimportant, but its effect on Erlanger's decision-making process is vital.

"Hearsay" is defined under Rule 801(c) of the Tennessee Rules of Evidence as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." However, the hearsay evidence rule does not operate to exclude every statement made by a witness to a third person. *Bradley v. Waderker*, No. M2002-02017-COA-R3-CV, 2003 WL 21946718, at *4 (Tenn. Ct. App. Aug. 13, 2003) (citing *Richter v. State*, 438 S.W.2d 362, 365 (Tenn. Crim. Ct. App. 1968)). When the "testimony is not being offered to prove the truth of the matters asserted by the out-of-court declarant," it is not hearsay. *Id.* (citing *State v. Miller*, 737 S.W.2d 556, 558–59 (Tenn. Ct. Crim. App. 1987). For example, an officer being informed by the dispatcher that a person was in distress suffering chest pain at a local hotel was not hearsay because the statement merely showed the officer's reasons for going to the hotel, not whether what the dispatcher said was true. *Id.*, 2003 WL 21946718, at *4. Similarly in *Thompson v. Adcox*, we held that the statement "the deal was off" was not hearsay because it was not presented to show that the deal was, in fact, off, but that it "show[ed] that [the defendant] believed it to be off and that it was for this reason he stopped payment on the check." 63 S.W.3d 783, 793 (Tenn. Ct. App. 2001). The statement was presented to determine the defendant's intent, not the actual truth of the matter, and it was thus admissible. *Id.*

Summary judgment was granted in this case because Officers failed to establish a *prima facie* case on the claims raised, not because of any purported hearsay statements. This claim lacks merit as the contested statements did not constitute hearsay.

## V. CONCLUSION

The judgment of the trial court is in all respects affirmed and the matter remanded. Costs of the appeal are assessed to the appellants, Jerry L. Lawrence, Gary Talley, Harold Holliday, Kenneth R. Cookston, Ronald J. Capetz, Gary C. Avans, and Rodney J. Patton.

_____
JOHN W. MCCLARTY, JUDGE